Filed 8/3/17

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E065257 |
| v. | (Super.Ct.No. FVI1102762) |
| MOSES MANUEL ECHAVARRIA, | OPINION |
| Defendant and Appellant. | |


APPEAL from the Superior Court of San Bernardino County. Eric M. Nakata, Judge. Reversed.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Moses Manual Echavarria, guilty of (1) first degree murder (Pen. Code, § 187, subd. (a))[1]; and (2) assault with a firearm (§ 245, subd. (a)(2)).  The jury found true the allegations that, during the murder, defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)); and personally used a firearm (§ 12022.5, subd. (a)).  The jury also found true the allegation that, during the assault, defendant personally used a firearm. (§ 12022.5, subds. (a) & (d).)[2]

Defendant moved the trial court for a new trial due to alleged juror misconduct. (§ 1181.)  The trial court denied defendant's motion.  The court sentenced defendant to prison for a determinate term of two years six months, and an indeterminate term of 50 years to life.

Defendant raises four issues on appeal.  First, defendant contends the trial court erred by denying his motion for a new trial.  Second, defendant contends the prosecutor erred by arguing the intent required for premeditated first degree murder is akin to choosing a beverage or a meal.  Third, in the alternative, defendant asserts his trial counsel was ineffective for failing to object to the prosecutor's argument about intent. Fourth, defendant asserts the trial court erred when it concluded the assault sentence must be served consecutive to the murder sentence.  We reverse the judgment.

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise provided.

[2] The foregoing verdicts were rendered during defendant's second trial.  At defendant's first trial, the jury deadlocked on the murder and assault charges and the trial court declared a mistrial.

# FACTUAL AND PROCEDURAL HISTORY

A. PROSECUTION'S CASE

Donald Allen Woodward, Sr., was defendant's mother's boyfriend. Woodward had a construction business—he performed stucco work. On one occasion, Woodward worked as a subcontractor for defendant's construction company. Woodward and defendant agreed Woodward would perform stucco work on a house in Barstow for $2,200. Woodward expected to be paid approximately one week after he completed his work, but he was not paid.

Woodward called defendant once or twice per week to ask about the payment. On one occasion, defendant's wife called Woodward and asked for receipts for material and labor expenses. Approximately three weeks after the stucco work was completed, defendant paid Woodward $1,000.

At Thanksgiving, Woodward spoke to defendant in person. Defendant told Woodward that defendant was paid $1,600 for the stucco work. Defendant was unsure if or when Woodward would receive the remaining $1,200. Woodward offered to work out a payment plan with defendant. The conversation ended in a friendly manner.

After the Thanksgiving conversation, Woodward continued calling defendant approximately once per week to collect the $1,200. On December 3, 2011, Woodward went to the home in Barstow where the stucco work had been performed to speak to the homeowner. On December 4, Woodward spoke to the homeowner's son on the telephone. Woodward asked the son if Woodward's stucco work was unsatisfactory.

3

The son explained that the stucco work was acceptable and that he believed the bill had been paid in full.

After the conversation ended, when Woodward was on his way home, he saw his friend, Andrew Battaglia, who lived on the same street as Woodward. Battaglia was in front of his (Battaglia's) house. Battaglia also performed construction work. Woodward stopped to speak with Battaglia. While Woodward was at Battaglia's home, defendant called Woodward. Woodward spoke to defendant on speakerphone, and Battaglia was nearby.

Defendant was "ranting and raving" about Woodward contacting the Barstow homeowner and son directly. Defendant said Woodward "violat[ed defendant's] job site." Woodward explained he contacted the homeowner to find out why the bill had not been paid in full. During the phone call, defendant faulted Woodward for not giving him an invoice for the stucco work.

Defendant told Woodward to meet him at Hesperia Lake. Defendant told Woodward to come alone. Woodward refused because it was dark outside. Woodward suggested the two meet at a well-lit public place because "[n]obody is going to do nothing stupid there." Defendant continued to demand Woodward meet him by himself at Hesperia Lake. Ultimately, defendant, who was angry, told Woodward to come to defendant's house. Woodward agreed to meet defendant at defendant's house. Woodward believed he was meeting defendant in order to give defendant an invoice.

Battaglia had an invoice book in his truck. Battaglia retrieved a blank invoice for Woodward. Woodward completed the invoice. Eric Brabant arrived at Battaglia's

4

house for the purpose of having dinner with Battaglia. Woodward, Battaglia, and Brabant left Battaglia's house. The three stopped and picked up Lee Keohi, who was Battaglia's friend.

The four men stopped at a liquor store where Woodward purchased an 18-pack of beer. The men then continued to defendant's apartment; they did not drink the beer while driving to defendant's apartment. The men's car was parked across the street from defendant's apartment, which is on a two-lane road. When the men arrived, Woodward saw defendant exiting the apartment. Defendant said to Woodward, "'I told you to come alone, mother fucker.'" Woodward responded that he was alone, because he was the only person exiting the car.

As Woodward walked toward defendant, while Woodward was in the middle of the street, defendant pointed a gun at Woodward. Defendant said he would "blow [Woodward's] fucking head off." Woodward had not noticed a gun when he initially saw defendant exiting the apartment. Woodward believed defendant must have been holding the gun behind him as he exited the apartment.

Woodward did not believe defendant would shoot anyone. Woodward continued walking toward defendant in order to give defendant the invoice. Defendant struck Woodward with the gun. Woodward fell to the ground. When Woodward fell, Battaglia exited the vehicle and ran toward Woodward. Brabant and Keohi remained in the vehicle. When Battaglia reached Woodward, he squatted, grabbed Woodward's shirt, and attempted to move Woodward away from defendant.

5

"[A]ll of a sudden," after Battaglia crouched down, defendant shot Battaglia. Battaglia stood up, then fell to the ground. "Seconds" passed between Battaglia squatting down and defendant shooting Battaglia. Defendant went inside his apartment. Battaglia died due to the gunshot. The bullet entered Battaglia's chest, near his shoulder, and traveled in a downward trajectory in Battaglia's body. Such a trajectory was possible if the shooter was standing and the victim was crouching down at the shooter's knees and bending forward at the waist. There was no gunpowder on Battaglia's shirt, which indicated Battaglia was more than three feet away from defendant when defendant shot him.

B.  DEFENDANT'S CASE

Defendant testified at his trial. Defendant spoke to Woodward on December 4 at 6:08 p.m. Woodward was angry during the phone call. Woodward told defendant "he was going to get his money one way or another, even if he had to kill [defendant]." Defendant suggested Woodward meet him at Hesperia Lake in order for Woodward to give defendant an invoice. Defendant planned to go to Big Bear with his family on the evening of December 4 followed by fishing at Hesperia Lake, in order to celebrate defendant's birthday, thus defendant and his family would be at the lake if Woodward stopped by.

Woodward declined meeting at Hesperia Lake. Woodward suggested meeting at a local restaurant. Defendant declined. Defendant suggested meeting at the sheriff's station, but Woodward declined. Defendant suggested meeting at defendant's house.

6

No time was scheduled for the meeting. Defendant did not recall telling Woodward to come to the meeting alone.

Defendant stayed home on December 4; he did not go to Big Bear or Hesperia Lake due to the situation with Woodward. After Woodward and defendant spoke on the telephone, defendant noticed three vehicles drive by his house. Defendant lived on a street with a lot of traffic. The first vehicle lingered for a while, drove by defendant's house slowly, and the driver looked at defendant suspiciously. The second vehicle belonged to a friend of Woodward. The third vehicle stopped in front of defendant's driveway, the driver lowered a window and then stared at defendant.

Defendant was alarmed and scared due to the phone call from Woodward and the people driving by his house. When Woodward arrived at defendant's house at approximately 8:00 p.m., defendant placed his gun in his back pocket. It was dark outside when Woodward arrived, but defendant could see Woodward was with other people.

Defendant exited his house, and walked toward Woodward. Woodward grabbed the back of defendant's shirt and said, "Let's do this, mother fucker." Defendant struck Woodward with his hand—defendant was not holding the gun. Woodward fell to the ground. A third person then punched defendant's face. Multiple people surrounded defendant and proceeded to punch and kick defendant. Defendant was punched and kicked all over his body.

Defendant could hear his daughter screaming. Defendant feared for his life and the lives of his wife and children. Defendant removed the gun from his pocket, and in

7

the process of moving it, the gun fired. Defendant was not aiming the gun when it fired and he did not intend to shoot anyone when it fired. After the gun fired, everyone dispersed. Defendant went inside his apartment. Defendant bled "pretty good" from his nose, mouth, and lips as a result of the beating. Defendant did not wash his face prior to law enforcement arriving at his house. A photograph of defendant did not show any blood from a nose injury. Defendant had blood on his boot.

### C.    PEOPLE'S REBUTTAL

San Bernardino County Sheriff's Sergeant Johnson spoke with defendant at the sheriff's station on December 4. Defendant was asked about injuries he sustained. Defendant complained of a bloody nose, bloody lip, and sore wrist. Sergeant Johnson noticed "one small dot or mark on [defendant's] upper lip." During the booking process, defendant lifted his shirt to reveal his tattoos. At that time, Sergeant Johnson did not see any bruises, scratches, or redness on defendant's arms, back, torso, or face. After defendant was transported to jail, Sergeant Johnson observed defendant change clothes. Defendant did not have any bruises, scratches, or marks on his legs.

## DISCUSSION

### A.    MOTION FOR NEW TRIAL

#### 1.    *PROCEDURAL HISTORY*

##### a)    Motion

Defendant filed a motion for new trial. In the motion, defendant asserted the jury committed misconduct by considering extraneous information about punishment when deciding whether the killing constituted first or second degree murder.

8

A declaration by Juror-12[3] was attached to the motion. Juror-12 declared that, on the second day of deliberations, a juror, possibly Juror-3, said she had worked in a prison and that defendant "could 'walk tomorrow' with time served" if he were convicted of second degree murder, but he "would be far less likely to get time served on a conviction for first degree murder." A different juror, possibly Juror-2, responded by saying, "'I don't want that.'" In the next vote, the juror who had said, "'I don't want that,'" changed his vote to select first degree murder. Juror-12 told his/her fellow jurors that information about defendant receiving credit for time served had not come from the court, and therefore should not be considered. Later that morning, four or five more jurors changed their votes to first degree murder.

b)      Opposition

The People opposed defendant's motion. The People asserted Juror-12's declaration lacked information about what occurred between Juror-3's statement and fellow jurors changing their votes. The People noted that on the second day of deliberations, the jury asked for testimony to be read back, viewed an exhibit, and continued deliberating throughout the day and into a third day. The People contended Juror-12 was speculating that Juror-3's statement caused the jurors to change their votes.

---

[3] In the record, jurors are identified by both their juror numbers and their seat numbers. In this opinion, we use the jurors' seat numbers when identifying the jurors.

9

c)    <u>Hearing</u>

The trial court held a hearing in which all 12 jurors testified.[4]  All the jurors denied having said defendant would not be sufficiently punished unless he were convicted of first degree murder.

Juror-1 recalled that another juror, during deliberations, said defendant might not be sufficiently punished unless he were convicted of first degree murder.  Juror-1 did not hear another juror say the information should not be considered.  Juror-2 did not recall hearing anyone say defendant might not be sufficiently punished unless he were convicted of first degree murder.  Juror-3, Juror-4, Juror-5, Juror-6, Juror-7, Juror-8, and Juror-9, denied hearing anyone say defendant would not be sufficiently punished unless he were convicted of first degree murder.

Juror-10 said the jury discussed punishment during their deliberations.  Juror-10 believed a fellow juror may have estimated the length of the prison terms for first degree murder and second degree murder.  The juror who spoke about prison terms said a second degree murder conviction could cause defendant to have "a short sentence compared to first degree."  Juror-10 recalled that another juror said the jury was not to consider information that came from outside the court.

Juror-11 heard a fellow juror, during deliberations, say defendant may not be sufficiently punished if defendant were convicted of second degree murder.  Juror-11,

---

[4] We exclude from our presentation of the facts statements that relate solely to the mental processes of the jurors because such information cannot be considered. (*People v. Danks* (2004) 32 Cal.4th 269, 302; *In re Stankewitz* (1985) 40 Cal.3d 391, 402 (*Stankewitz*); *People v. Nesler* (1997) 16 Cal.4th 561, 584.)

10

who was the jury foreperson, immediately responded that the jury should not consider information from outside the court.

Juror-12 heard a fellow juror, during deliberations, say defendant may not be sufficiently punished if defendant were convicted of second degree murder. Juror-12 did not hear another juror say such information should not be considered.

The trial court said it believed, based upon the evidence, "there was some discussion" during the jury's deliberations—implying the court found the jury did discuss the length of possible prison terms. The court said the next issue is "what does that mean?" The court suggested the attorneys submit supplemental points and authorities.

### d) Supplement to Defendant's Motion

Defendant submitted a supplement to his motion. A declaration by defendant's wife (Wife) was included in the supplement. Wife declared that she was sitting in the courthouse hallway when the jurors were being examined. Wife saw one of the jurors, one of the first to be examined, exit the courtroom. The juror then told the other jurors "'just say no' to the questions." Wife did not realize the importance of this statement until she spoke to defendant's attorney at a later date. A declaration by defendant's sister was also attached to the supplement. Defendant's sister was also present in the hallway and heard the juror tell the other jurors to respond "'no'" to the court's questions. Defendant asserted the declarations showed the jurors who denied hearing a statement about punishment during deliberations may not have been honest.

11

e)      Supplement to Opposition

The prosecutor submitted a supplement to the opposition.  The prosecutor asserted any misconduct was not prejudicial.  The prosecutor asserted "only a few jurors" recalled hearing a comment about punishment, and both Juror-11 and Juror-12 said they told their fellow jurors such outside information should not be considered.  The prosecutor asserted that under these facts prejudice was not shown.

f)      Hearing

The trial court held a hearing on defendant's motion.  Defense counsel asserted the juror who told the other jurors to respond "no" to the court's questions was the same juror who stated defendant would not serve prison time if convicted of second degree murder.  The prosecutor asserted there was nothing sufficiently identifying the juror(s) who made the complained-of remarks.  The trial court found defendant received a fair trial and denied defendant's motion.  The trial court did not state its reasons for concluding defendant received a fair trial.

2.      *ANALYSIS*

a)      Contention

Defendant asserts the trial court correctly found the jurors discussed the length of defendant's possible prison terms, but the trial court erred by concluding the trial was fair.  The People concede juror misconduct occurred, but assert the presumption of prejudice was successfully rebutted.

It is unclear whether the trial court found misconduct occurred.  The trial court found a discussion about sentencing took place amongst the jurors and the court

12

concluded defendant's trial was fair. It is possible the court found the discussion did not rise to the level of misconduct. It is also possible the court found the discussion constituted non-prejudicial misconduct. Because the People concede misconduct occurred, we will focus our analysis on the issue of prejudice.

b)    Law

The law concerning prejudice lacks clarity. In some cases, there is a focus on the presumption of prejudice that arises when misconduct is found. In those cases, the analysis concerns whether the prosecutor has successfully rebutted the presumption of prejudice. (*In re Malone* (1996) 12 Cal.4th 935, 964 ["The People have successfully rebutted the presumption of prejudice"]; *Stankewitz*, *supra*, 40 Cal.3d at p. 402 [the People's rebuttal "falls far short of the mark"]; *In re Hitchings* (1993) 6 Cal.4th 97, 123 (*Hitchings*)["presumption of prejudice that stands unrebutted"]; *People v. Weatherton* (2014) 59 Cal.4th 589, 600 [prosecutor must rebut the presumption].)

Yet, in other cases, the focus is on the need for a showing of substantial prejudice and whether it has been shown the prejudice was sufficiently substantial. (*People v. Mendoza* (2000) 24 Cal.4th 130, 167 ["Nor has he shown that if such a discussion occurred, he suffered prejudice"]; *People v. Ramos* (2004) 34 Cal.4th 494, 521 (*Ramos*) ["We find no substantial likelihood that the article influenced the jury negatively"].)

Our understanding of the law is as follows: Juror misconduct raises a presumption of prejudice. The People may rebut the presumption by showing no prejudice actually resulted from the misconduct. (*Hitchings*, *supra*, 6 Cal.4th at p. 118.) If the People fail in their rebuttal, then prejudice exists. The appellate court must then

13

examine the entire record to determine if "'"there is a reasonable probability of actual harm to the [defendant] resulting from the misconduct."'" (*Id.* at p. 119.) If the reviewing court finds there is not a substantial likelihood of harm then there is no need for a new trial. (*People v. Hardy* (1992) 2 Cal.4th 86, 174 [reviewing court examines if there is a substantial likelihood of harm].)

The prejudice analysis raises mixed questions of law and fact. The trial court's factual findings are accepted if they are supported by substantial evidence. The trial court's ultimate finding concerning prejudice is reviewed de novo. (*Ramos*, *supra*, 34 Cal.4th at p. 520.)

c)      Rebuttal of the Presumption

The "presumption of prejudice '"may be rebutted by an affirmative evidentiary showing that prejudice does not exist."'" (*Hitchings*, *supra*, 6 Cal.4th at p. 119; *People v. Jackson* (2016) 1 Cal.5th 269, 332.) In regard to the amount of affirmative evidence that is needed, the amount appears to vary depending on the specific facts of the case—the greater the misconduct, the more affirmative evidence that must be shown to rebut the presumption of prejudice.

On the far end of the scale, where there is no misconduct and no rebuttal evidence is needed, our Supreme Court has written that juror comments speculating on punishment are "an inevitable feature of the jury system," and are not misconduct. (*People v. Dykes* (2009) 46 Cal.4th 731, 812 (*Dykes*); see also *People v. Schmeck* (2005) 37 Cal.4th 240, 306-307, abrogated on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636, 642.)

14

In *Dykes*, during death penalty deliberations, the jurors commented on instances they had heard of where people had been sentenced to life without the possibility of parole, but were ultimately released from prison. Some jurors "'said that if they gave [the defendant] the death penalty, it was possible that he would never get executed, but it would certainly be harder for him to get out of jail and certainly a harder punishment." (*Dykes*, *supra*, 46 Cal.4th at p. 808, fn. 21.) One juror told the other jurors it was inappropriate to consider those ideas and they should treat the death penalty as possibly resulting in the defendant being executed within a short period of time. (*Ibid*.) The court found the jury did not engage in misconduct because discussions about penalties are "an inevitable feature of the jury system." (*Id*. at p. 812.)

Moving toward the middle of the scale are cases where the discussion of extraneous information constituted misconduct, but the misconduct was determined to be nonprejudicial. (*People v. Loker* (2008) 44 Cal.4th 691, 750; *People v. Tafoya* (2007) 42 Cal.4th 147, 193.) In *Loker*, the jurors discussed the cost to taxpayers for a sentence of life in prison without the possibility of parole versus the cost of the death penalty. The foreperson reminded the jury not to consider such ideas. The jury's discussion constituted misconduct, but it was not prejudicial because the discussion was brief and the foreperson admonished the jury. (*Loker*, at p. 750.)

Moving to the far/other end of the scale there are cases where the misconduct has been found to be prejudicial. (*Stankewitz*, *supra*, 40 Cal.3d 391; *People v. Honeycutt* (1977) 20 Cal.3d 150, 158.) In *Stankewitz*, one juror, on several occasions, advised his

15

fellow jurors "that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as [the defendant] took the wallets at gunpoint in this case he committed robbery, whether or not he intended to keep them." (*Stankewitz*, at pp. 396, 400.)

The Supreme Court explained the presumption of prejudice is "stronger when, as here, the misconduct goes to a key issue in the case." (*Stankewitz*, *supra*, 40 Cal.3d at p. 402.) The court concluded the People failed to rebut the presumption of prejudice because the People did not provide affirmative evidence that the jurors' deliberations were not affected by the misconduct. (*Id.* at pp. 402-403.)

Our review of the foregoing cases leads us to the following understanding. The gravity of the misconduct correlates with the amount of proof necessary to rebut the presumption of prejudice. The seriousness of the misconduct can be evaluated by looking at (1) whether the jury was discussing an issue within the scope of their duties, e.g., discussing sentence information during penalty deliberations or during guilt deliberations; (2) whether the extraneous information appeared to come from a person with authority, e.g., a police officer; (3) whether it was an abstract discussion or if the defendant was discussed directly, e.g., an abstract discussion about the cost of imprisonment versus a discussion about imprisoning the defendant; and (4) the length of the discussion concerning the extraneous information.

16

First, in the instant case, extraneous information about sentencing was discussed during the guilt phase of the proceedings. In the context of this case, that factor raises the seriousness level of the misconduct because at least one juror was using irrelevant sentencing information to determine guilt. Second, the extraneous information was presented by a person who appeared to have some authority on the subject. The juror claimed her knowledge was derived from experience working in a prison.[5] This also raises the seriousness level of the misconduct.

Third, the discussion was personal to defendant. The juror said "[Defendant] could 'walk tomorrow' with time served," if he were convicted of a crime less than first degree murder. It was not an abstract discussion about prison credits. This factor also increases the seriousness level of the misconduct. Fourth, the discussion appears to have been brief. The juror made the statement about punishment. Another juror responded, "'I don't want that.'" Then the foreperson and/or Juror-12 reminded the jurors not to consider such information. The brevity of the discussion lessens the seriousness level of the misconduct.

The People contend they successfully rebutted the presumption of prejudice. The People assert the jury was instructed to base its verdict only on the evidence received at trial, and that when the comment about punishment was made, the jury foreperson immediately reminded the jurors not to consider extraneous information. "[J]ury

_____

[5] During voir dire, Juror-3 said she had worked at the Victor Valley Medium Correctional Facility. Juror-3 explained that the facility is a level-3/level-4 private prison in Adelanto.

misconduct raises a presumption of prejudice; and unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial." (*People v. Pierce* (1979) 24 Cal.3d 199, 207.)

The problem with the People's evidence is that Juror-1 heard the statement about punishment, but did not hear anyone say such information should not be considered. Given the seriousness of the misconduct, the People need to provide more evidence to affirmatively show no prejudice occurred. Reliance on an admonition that was not heard by all the jurors is insufficient.

The People also rely on the instruction given by the trial court informing the jurors that they are not to consider punishment. The People's reliance on this instruction is problematic. The People have conceded misconduct occurred. Thus, the People have conceded the jurors violated this instruction. Pointing to the instruction that was violated as proof that prejudice did not arise from the violation is unpersuasive because, since the People concede there was misconduct, the jurors did not follow the instruction.

The People rely on *People v. Leonard* (2007) 40 Cal.4th 1370, to support their position. In *Leonard*, during penalty deliberations, the jurors discussed the premise that it is more expensive for taxpayers to keep a person in prison for life than to sentence the person to death. The foreperson reminded the jurors that it was improper to consider such a premise. The high court, without an explanation, concluded that if the comments were improper, the error was harmless. The implication is that the foreperson's admonition cured any harm. (*Id.* at p. 1426.)

The instant case is distinguishable from *Leonard*. In *Leonard*, the jury was discussing sentencing during penalty deliberations. In the instant case, the jury was using sentencing information to decide issues of guilt. In *Leonard*, the jury had an abstract discussion about the cost of life imprisonment versus the death penalty. In the instant case, the jury discussed how defendant, in particular, would not serve a prison term if he were convicted of anything less than first degree murder. Also, in the present case, the information about sentencing came from a person who claimed to have knowledge of the subject based upon experience working in a prison.

The seriousness of the misconduct in the present case is greater than in *Leonard*. As a result, an admonition by the foreperson is not sufficient to rebut the prejudice in this case, especially when the admonition was not heard by all the jurors who heard the statement about punishment.

The problem the People are confronting on appeal is that the prosecutor did not elicit sufficient information to rebut the presumption of prejudice. The prosecutor perhaps should have asked questions about timing of the votes. For example, was the statement about punishment made within five minutes of the next vote when the juror who said, "'I don't want that'" changed his vote, or was it two hours later. The lack of evidence offered by the People means there has not been a rebuttal of the presumption of prejudice.

d)      Substantial Prejudice

We now examine whether the prejudice is substantial. There are two methods for measuring prejudice: (1) inherent prejudice, and (2) actual bias. If either test shows

19

substantial prejudice, then the judgment must be reversed.  (*Danks*, *supra*, 32 Cal.4th at p. 303.)

### i)  *Inherent Prejudice*

The first test concerns inherent prejudice.  It examines whether "'the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment.'"  (*Danks*, *supra*, 32 Cal.4th at p. 303.)

"In a criminal case, improper reference to penalty or punishment is generally held reversible because such references are irrelevant, the jury is likely to be misled in determining the issue of guilt or innocence upon the basis of such improper considerations, and, if permitted, it would lead to involvement in collateral matters the probative value of which, if any, would be far outweighed by the prejudicial effect thereof."  (*People v. Allen* (1973) 29 Cal.App.3d 932, 936-937; see also *People v. Allison* (1989) 48 Cal.3d 879, 892 ["A defendant's possible punishment is not a proper matter for the jury's consideration in determining guilt or innocence"]; see also *Shannon v. U.S.* (1994) 512 U.S. 573, 579 ["providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion"].)

If, during trial, it had been said that only a conviction for first degree murder would result in a prison sentence of any significance, admission of the statement would be error because the statement would cause the jury to consider the irrelevant issue of punishment when determining guilt or innocence.  In other words, the evidence would be prejudicial because it risks the jury confusing its task of fact-finding with the court's

task of sentencing defendant. The evidence would have no probative value because the jury is not tasked with sentencing defendant. Accordingly, it would have been error to admit such a statement.

When a court errs by admitting evidence that is more prejudicial than probative (Evid. Code, § 352), we examine whether the error is harmless. Because the error in this case ultimately concerns defendant's right to an impartial jury, we apply the federal standard. (*People v. Gonzales* (2011) 51 Cal.4th 894, 924.) In applying that standard, we examine whether, beyond a reasonable doubt, the error did not contribute to the conviction. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Stated differently, whether, beyond a reasonable doubt, the error was not substantially likely to have influenced a juror. (See *People v. Jackson*, *supra*, 1 Cal.5th at p. 332 ["substantially likely"]; see also *In re Carpenter* (1995) 9 Cal.4th 634, 653 [the test "is analogous to the general standard for harmless error analysis"].) We limit our harmless error analysis to the trial portion of the record—excluding the posttrial record. (*Danks*, *supra*, 32 Cal.4th at p. 303 [review the trial record].)

The prosecutor argued defendant premeditated the killing of Battaglia by arming himself with a gun, taking the gun from his pocket, pointing the gun at Battaglia, and firing the gun. The prosecutor did not argue transferred intent, i.e., it was not argued that defendant premeditated the murder of Woodward and accidentally shot Battaglia. (See *People v. Shabazz* (2006) 38 Cal.4th 55, 62-63 [transferred intent].) The prosecutor asserted defendant premeditated the murder of Battaglia.

The theory of premeditation as it relates to Battaglia is weak. "'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.'" (*People v. Casares* (2016) 62 Cal.4th 808, 824.)

There is no evidence indicating defendant knew Battaglia would be coming to defendant's house, such that defendant was preparing to kill Battaglia or reflecting on killing Battaglia prior to Battaglia's arrival at the house; the theory of premeditation is that it occurred in the moment.

The most favorable evidence for premeditation and deliberation is Keohi's testimony that from the time Battaglia exited the car, until the time that defendant shot Battaglia, "a couple of minutes" passed. In interpreting the evidence in a manner favorable to finding premeditation and deliberation, one can infer that as Battaglia was running toward Woodward, defendant continued to strike or attempted to strike Woodward; when Battaglia arrived to Woodward's side, Battaglia pushed defendant away; Battaglia crouched down, and defendant shot Battaglia. Brabant estimated that seconds passed between Battaglia crouching down and defendant shooting Battaglia.

Within that sequence of events, there is little evidence demonstrating a moment of reflection—where defendant paused and reflected upon killing Battaglia. The evidence reflects an intent to kill, but the evidence of premeditation and deliberation is weak. Due to the weak evidence concerning premeditation and deliberation, we cannot conclude the evidence is overwhelming, such that the erroneous admission of

22

information about sentencing is harmless beyond a reasonable doubt.  In other words, given the weak evidence of deliberation and premeditation, it is possible the sentencing information caused a juror to vote for first degree murder—not the evidence.

The statement about punishment, if it had been introduced at trial, would have necessitated reversal of the judgment.  As a result, the misconduct is inherently prejudicial.

ii)    <em>Actual Bias</em>

As explained *ante*, there are two methods for measuring prejudice.  If either test results in a finding of substantial prejudice, then the judgment must be reversed.  (*Danks*, *supra*, 32 Cal.4th at p. 303.)  For the sake of thoroughness, we address the second test:  actual bias.  (*Ramos*, *supra*, 34 Cal.4th at p. 519.)

Under the actual bias test, a court examines whether "from the nature of the misconduct and surrounding circumstances, it is substantially likely a juror 'was actually biased' against the defendant." (*Ramos, supra,* 34 Cal.4th at p. 519.)  "[A]ctual bias supporting an attack on the verdict is similar to actual bias warranting a juror's disqualification." (*People v. Nesler*, *supra*, 16 Cal.4th at p. 581.)  "The term 'actual bias' may include a state of mind resulting from a juror's actually being influenced by extraneous information about a party." (*Ibid.*)  A juror is actually biased by extraneous information when s/he is unable to put aside the extrajudicial information and render a verdict based solely upon the evidence received at trial. (*Id.* at p. 583.)  "[A] conviction cannot stand if even a single juror has been improperly influenced." (*People v. Pierce*,

23

*supra*, 24 Cal.3d at p. 208.) We review the entire record when analyzing the issue of actual bias. (*People v. Danks*, *supra*, 32 Cal.4th at p. 303.)

A juror, possibly Juror-3, said during deliberations that she worked in a prison and therefore knew that if defendant were convicted of a crime less than first degree murder then he "could 'walk tomorrow' with time served," but if defendant were convicted of first degree murder then he "would be far less likely to get time served." Another juror, possibly Juror-2, immediately said, "'I don't want that.'" In the next round of voting, the juror who said, "'I don't want that'" changed his vote to first degree murder.

If the juror who made the statement about punishment were not influenced by her experience working in a prison, then she would not have shared the punishment information with jurors. Juror-12 felt there was hostility toward "anyone not signing up for first degree murder." One juror, possibly Juror-2, said "'I don't want that'" and changed his vote to first degree murder following the statement about punishment. Thus, it can be inferred that the statement about punishment was made in an attempt to convince other jurors to vote for first degree murder. It can reasonably be concluded that the information about punishment was shared to ensure defendant would receive the greatest amount of punishment, regardless of guilt. Therefore, there was exhibited bias against defendant.

The record reflects a substantial likelihood that the juror who made the statement about punishment was actually influenced by her experience of working in a prison, which caused her to be unable to render a verdict based solely upon the evidence

24

received at trial, given that she shared the sentencing information with other jurors. The juror wanted to ensure defendant received the greatest possible sentence, which required a conviction for first degree murder, regardless of the evidence. (See *People v. Nesler, supra*, 16 Cal.4th at p. 583 [juror would not have used extraneous information to influence other jurors if the juror were not influenced by the extraneous information herself]; see also *People v. Hord* (1993) 15 Cal.App.4th 711, 728 ["For example, if a juror were to say, . . . '[W]e will have to find the defendant guilty of the greatest charges to ensure he will be adequately punished,' . . . [s]uch [a] comment[ is] more likely to influence that juror and other jurors"].) In sum, actual bias has been shown.

### e) Summary

The People concede there was juror misconduct. The People failed to rebut the presumption of prejudice. The prejudice is substantial because it is inherent and reflects actual bias. Accordingly, the trial court erred by denying defendant's motion for a new trial. Due to the jury misconduct, all of defendant's convictions and enhancements must be reversed. (See *People v. Weatherton, supra*, 59 Cal.4th 589, 590, 601 [all convictions reversed due to juror misconduct].)

### B. REMAINING CONTENTIONS

Defendant asserts (1) the prosecutor committed misconduct; (2) if the prosecutorial misconduct issue was forfeited, then his trial counsel was ineffective; and (3) the trial court made a sentencing error. We have concluded *ante* that the judgment must be reversed. As a result, we can provide defendant no further relief by examining

25

the remaining issues.  The remaining issues are moot.  (*People v. Travis* (2006) 139

Cal.App.4th 1271, 1280.)

## DISPOSITION

The judgment is reversed.

CERTIFIED FOR PUBLICATION


MILLER _____

J.


We concur:


McKINSTER _____

Acting P. J.


SLOUGH _____

J.