Filed 3/3/23  P. v. Venegas CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SALVADOR VENEGAS,<br><br>    Defendant and Appellant. | E075325<br><br>(Super.Ct.No. SWF1401683)<br><br>ORDER MODIFYING OPINION; AND DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

The petition for rehearing filed by appellant on March 13, 2023, is denied.  The opinion filed in this matter on February 10, 2023, is modified as follows:

Page 2, paragraph 4, the first sentence is modified to read "Defendant raises 11 issues on appeal."

Page 3, paragraph 2, the fourth and fifth sentences are modified to read "Tenth, defendant contends the trial court erred by excluding part of Juror No. 7's declaration.  Eleventh, defendant asserts the two abstracts of judgment should be corrected."

Page 3, the "**FACTS**" section the two paragraphs are consolidated into one paragraph.

1

Page 23, footnote No. 4, is modified to read "In this section of the opinion, in presenting the jurors' declarations, we have omitted the portions that the trial court ruled inadmissible (Evid. Code, § 1150).

Page 26, the first full paragraph, the third sentence is modified to read "The trial court's conclusion is reasonable because one needs to know whether the jurors' discussions occurred in the guilt or penalty phase of the proceedings, and therefore, a diligent attorney would have clarified that evidence prior to the hearing.

Page 26, a new sub-subsection "c." is inserted as follows:

"c.    Excluded Evidence

"Defendant contends "[t]he trial court erred by redacting the portion of Juror No. 7's declaration," which reads, "The jury discussed why [defendant] didn't testify.  The consensus was that he 'would probably dig himself into a hole.' "  For the sake of judicial efficiency, we will assume, without deciding, that the trial court erred and move to the issue of prejudice.

"When considering the issue of juror misconduct, the trial court questioned whether the jurors' discussions about defendant's failure to testify occurred during the guilt or penalty phase of the proceedings because the timing was unclear from the jurors' declarations.  The trial court remarked that, in the penalty phase of the proceedings, a focus of defendant's argument "related to identity and whether or not there should be some lingering doubt on who the shooter or shooters were," so the jury could have been discussing guilt in the penalty phase.  However, the trial court determined that the misconduct "probably occurred during the guilt phase.  But there's

nothing in the declarations that say[s] that." In ruling on the motion, the trial court said, "[W]e don't know [in] what phase of the trial [the discussions occurred]."

"If the trial court had considered Juror No. 7's statement about the jury having reached a consensus that defendant " 'would probably dig himself into a hole' " if he testified, then there would still be ambiguity regarding when, in the course of deliberations, that consensus was reached, i.e., in the guilt phase or the penalty phase. Accordingly, the error was not prejudicial because the problem remains that it is unclear at what point the jurors discussed defendant's failure to testify."

Page 26, "Presumption of Prejudice" is now sub-subsection "d."

Page 26, the second sentence in the new sub-subsection "d." is modified to read "Defendant's argument does not explicitly specify if the misconduct occurred during the guilt and/or penalty phase(s) of the proceedings, but, for the same of having a thorough discussion of this issue, we will make the assumption that it occurred during the guilt phase.

Page 27, the second full paragraph, the last sentence is modified to read "In other words, the jury inferred that defendant elected not to testify due to potential violence by gang members."

Page 28, the second full paragraph, The sentence after the citation to *Solorio* is modified to read "Juror No. 10 declared, "We discussed that [defendant didn't testify because he would put himself at risk because of the gang."

Page 29, "Constitutional Rights" is now sub-subsection "e."

Except for these modifications, the opinion remains unchanged.  The modifications do not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

4

Filed 2/10/23  P. v. Venegas CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SALVADOR VENEGAS,<br><br>    Defendant and Appellant. | E075325<br><br>(Super.Ct.No. SWF1401683)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Otis Sterling III, Judge.

Affirmed with directions.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant, Salvador Venegas, guilty of premeditated and deliberate first degree murder (Pen. Code, § 187, subd. (a)[1], and six counts of attempted premeditated and deliberate first degree murder (§§ 187, subd. (a) & 664). The jury found true that allegations that the murder and attempted murders were committed to benefit a criminal street gang. (§ 186.22, subd. (b)(1)(C).) Further, the jury found defendant was a principal part of the murder and attempted murders. (§ 12022.53, subd. (e).)

In regard to the murder, the jury found true the special circumstance allegation that defendant intentionally killed Runar Claus (the victim) while defendant was an active participant in a criminal street gang and defendant murdered the victim in furtherance of the gang's activities. (§ 190.2, subd. (a)(22).) The trial court found true the allegations that defendant suffered two prior strike convictions (§§ 667, subds. (c) & (e)(2)(A) & 1170.12, subd. (c)(2)(A)), and a prior serious felony conviction (§ 667, subd. (a)).

In the penalty portion of the trial, the jury fixed the penalty for the murder at life without the possibility of parole (LWOP), rather than death. The trial court sentenced defendant to prison for a determinate term of 125 years, plus an indeterminate term of 295 years to life, plus a term of LWOP.

Defendant raises 10 issues on appeal. First, defendant contends the trial court erred by denying his motion to suppress GPS evidence. Second, defendant asserts the

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

trial court erred by admitting a kite authored by defendant. Third, defendant contends the trial court erred by permitting the jury to be present when a prosecution witness refused to testify. Fourth, defendant asserts the trial court erred in its admonition to the jury concerning the witness's refusal to testify. Fifth, defendant contends the prosecutor erred in his closing argument. Sixth, defendant asserts that the cumulative effect of the foregoing alleged errors created a denial of due process.

Seventh, defendant contends the trial court erred by not holding an evidentiary hearing on his motion for new trial. Eighth, defendant asserts the trial court erred by not granting a continuance for his motion for new trial. Ninth, defendant contends the trial court erred by denying his motion for new trial. Tenth, defendant asserts the two abstracts of judgment should be corrected. We affirm with directions.

## FACTS

On the night of February 5, 2014, the victim, the victim's brother, the victim's cousin, and approximately four friends (collectively, the group) were drinking beer, listening to music, and talking in the garage and on the driveway of the victim's house in San Jacinto. Defendant and an accomplice walked along the sidewalk in the direction of the victim's house. From the sidewalk in front of the victim's house, defendant or his accomplice asked the group, " 'Where you from?' " and then defendant and his accomplice, from the sidewalk, immediately began shooting at the group. Sixteen to 20 shots were fired. Defendant and his accomplice ran away.

When the shooting stopped, the victim was on the ground suffering from a single gunshot wound; the ammunition passed through the victim's aorta. Paramedics transported the victim to the hospital where the victim died. No one else was injured.

## DISCUSSION

### A.    SUPPRESSION OF GLOBAL POSITIONING SYSTEM (GPS) DATA

#### 1.    *PROCEDURAL HISTORY*

The following three paragraphs are taken from defendant's motion to suppress: "[O]n January 10, 2014 defendant was arrested during a parole compliance check for possessing a .38-caliber revolver in his residence. He was booked into Southwest Detention Center and eventually posted bail on February 4, 2014 through Bail Hotline Bail Bonds . . . , the day before the shooting. A condition of his bail[, imposed by Bail Hotline Bail Bonds,] was that he was required to where [*sic*] a GPS ankle monitor that 'pinged' his approximate location every five minutes."

"On March 3, 2014[, Riverside County Sheriff's] Investigator Alfaro contacted Chris Ramos from Bail Hotline Bail Bonds and requested the GPS data from defendant's ankle monitor. That information was provided to law enforcement. A search warrant was not issued for the seizure of those records.

"Investigators from the Riverside Sheriff's Office analyzed the data and developed a timeline which they believe shows the defendant was in the vicinity of the [victim's house] at the approximate time of the shooting . . . . Of significance, defendant . . . was residing at [a home], about [one-half] block from the [victim's house]. [¶] The GPS data is central to the People's case in chief."

4

Defendant moved to suppress the GPS data as an unreasonable warrantless search and seizure. (§ 1538.5, subd. (a)(1)(A).) Defendant contended he "had a reasonable expectation of privacy in his movements."

In opposing defendant's suppression motion, the People contended defendant did not have a reasonable expectation of privacy in the GPS data because, in order to obtain a bail bond, defendant signed a contract agreeing to wear the ankle monitor and waiving his rights pertaining to searches. The contract was with Fugitive Recovery Investigations, Inc. (FRI), and the terms included the following: "I agree to waive any rights that may restrict, in any way, full searches and inspection of my person, property, possession or workplace(s)."

The trial court said its tentative ruling was to deny the motion because (1) defendant consented to wearing the ankle monitor; (2) a private company—not the government—placed the ankle monitor on defendant as a condition of providing his bail; and (3) FRI voluntarily provided the GPS data to the sheriff's deputies.

Defendant asserted that he agreed to FRI having his GPS data, but he did not consent to law enforcement having his GPS data. The trial court concluded defendant "had a diminished expectation of privacy as it relates to [FRI]" having the GPS data. Further, the trial court found there was no governmental intrusion because FRI willingly provided the GPS data to the deputies. The trial court stated, "[I]f there was an issue, [defendant's] issue would be with [FRI] and not the government." The trial court denied defendant's motion to suppress.

## 2. *ANALYSIS*

Defendant contends the trial court erred by denying his motion to suppress the GPS data. The trial court did not err because defendant was on parole.

Parolees are "subject to search or seizure by a probation or parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause." (§ 3067, subd. (b)(3); see also *Samson v. California* (2006) 547 U.S. 843, 852.) "[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." (*Samson*, at p. 857.) However, the officer conducting the search must be aware of the defendant's status as a parolee in order to justify a warrantless search. (*People v. Moore* (2006) 39 Cal.4th 168, 173.)

Defendant was paroled on December 20, 2013, and discharged from parole on December 19, 2016. The murder in this case occurred on February 5, 2014. "On February 27, 2014 Deputy Rutigliano and his partner Deputy Lively of the Gang Task Force conducted a traffic stop on a white Dodge Truck . . . . Deputy Lively recognized the passenger, [defendant], as being on active CDC parole and was wanted for questioning by the Sheriff's Central Homicide Unit." "Investigator Alfaro from the Central Homicide Unit responded to the scene [of the traffic stop] because the defendant . . . was wanted for murder." Officers stopped defendant on the street, rather than going to defendant's home, because "law enforcement knew how dangerous he was, that he had possessed guns in the past, that they knew of his criminal history." Defendant was searched and arrested at the traffic stop. Alfaro obtained the GPS data for the shooting in March 2014.

6

Defendant was on parole at the time of the murder and at the time the GPS data was given to Alfaro. Alfaro knew that defendant was on parole when obtaining the GPS data in March 2014 because (1) Alfaro was part of the homicide team looking for defendant, and looking for defendant involved knowing how dangerous he was, which meant knowing his criminal history, i.e., his parole status; and (2) Alfaro was part of the traffic stop in February 2014, in which officers were aware of defendant's parole status. Further, Alfaro confiscated and searched defendant's wallet and telephone during the traffic stop, which indicates Alfaro was aware that defendant was subject to warrantless searches. Because defendant was on parole and Alfaro knew that defendant was on parole, the trial court did not err by denying defendant's motion to suppress the GPS data.

B.     SUPPRESSION OF A KITE

1.     *PROCEDURAL HISTORY*

Following his January 10, 2014, arrest for possessing a revolver, defendant was booked into the Southwest Detention Center, where he stayed until he posted bail on February 4, 2014. On January 14, 2014, deputies in the jail found a kite in the door of defendant's cell. The kite was written by defendant, who is a member of the First Street gang in San Jacinto, to John Lewis who is also a member of the First Street gang.

The kite read in relevant part, "First and foremost—First all day :) I send my utmost to you homeboy. . . . I know what you mean about the toy. If its ready to work then it can be used again. Let me know how to get it! :) So I know whats up? :) I

7

don't have anything for Menace.  Just send him my love.  Gracias."  (*Sic*; all caps.

omitted.)

"First all day" means defendant is representing the First Street gang.  The "toy"

is likely a reference to a firearm.  The kite "indicates that [the gang has] a gun.  It also

indicates that it's being hidden because, for whatever reason, they don't want law

enforcement to find it because" the gun might be "connected to a crime."

Defense counsel asserted that the kite should be excluded because "[t]here's no

evidence or information that that was the gun or that [it] had anything to do with the

shooting that took place on February 5th."  Defendant asserted the prejudice created by

the kite outweighed any probative value.

The prosecutor argued, in regard to the murder weapon, "[W]e don't know where

he got the gun nor do we know where the gun went.  The gun has never been recovered.

So, in this particular case, I think him less than a month before the murder telling

another documented well-known gang member of his willingness to commit acts of

violence and looking for a gun—I think is highly probative in this case."

The trial court responded, "I think they can say this all relates to the gun.  It

shows that he was looking to get in possession of a gun and had a gun or looked to have

a gun shortly before this homicide was committed.  That seems pretty relevant."

Defense counsel asserted, "The problem is, your Honor, both before and after

this, [defendant] was also arrested in possession of other unrelated firearms.  The

suggestion here is almost propensity evidence.  It's being presented almost for purposes

of saying, Hey, well, this guy is out there willing to go and commit other crimes, which

8

I think is an improper purpose unto itself." The trial court allowed the firearm portion of the kite to be admitted into evidence.

During closing argument, the prosecutor argued, "It doesn't take an expert to know that he's talking about a gun. That's what he's talking about, looking for a gun on January 14th, 2014, three weeks before the murder."

2. *ANALYSIS*

Defendant contends the trial court erred by admitting the kite because it was propensity evidence that should have been excluded as more prejudicial than probative. (Evid. Code, § 352.)

"Evidence of other crimes is inadmissible if offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged. The evidence is then excluded because its probative value is outweighed by its prejudicial effect." (*People v. Stanley* (1967) 67 Cal.2d 812, 816; see also *People v. Catlin* (2001) 26 Cal.4th 81, 145-146; Evid. Code, § 1101, subd. (b).) We apply the abuse of discretion standard of review. (*People v. Harris* (1977) 71 Cal.App.3d 959, 964.)

The evidence of defendant asking how to obtain a firearm was relevant because it helped to establish that defendant may have had access to a firearm, which may have allowed him to shoot the victim. Thus, the portion of the kite concerning "the toy" had probative value and was not admitted purely to demonstrate that defendant was a felon seeking a firearm.

In regard to prejudice, the defense did not dispute that defendant was a gang member and that gangs are violent. Thus, the jury was aware that defendant was a

9

member of a violent group. To the extent the jury believed that "the toy" was a firearm, the kite did not cause defendant to appear more violent than he already may have appeared due to being a member of a violent gang. In other words, the "toy" discussion in the kite was not greatly prejudicial because there was other evidence indicating defendant was associated with violence. Because the kite had probative value and the risk of prejudice was minimal, the trial court did not abuse its discretion by admitting the kite.

Defendant asserts, "The erroneous admission of the kite's gun reference violated [defendant's] Fourteenth Amendment right to a fair trial by making it likely the jury would infer appellant obtained a gun used in the shooting on February 5, or at a minimum, that he had a propensity to use a gun violently as suggested by the prosecution." The trial court did not err in admitting the kite because the kite was relevant in establishing defendant's access to a firearm. Given the kite's probative value, we conclude defendant's right to a fair trial was not violated. (*Jammal v. Van de Kamp* (1991 9th Cir.) 926 F.2d 918, 920 ["Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process"].)

C.    REFUSAL TO TESTIFY

1.    *PROCEDURAL HISTORY*

The prosecutor planned to call Julian Baez as a witness. Baez "took some kites from [defendant] and passed them off to law enforcement." At a prior court hearing, Baez had been "animated about his position about refusing to testify, not wanting to testify." Defense counsel asserted it would be "highly inflammatory" to permit Baez to

10

refuse to testify in the presence of the jury. Defense counsel was concerned that the jury would make "an improper inference" as to why Baez refused to testify, e.g., Baez feared defendant due to defendant's position as a gang shot caller.

The prosecutor asserted that "every other witness . . . in the case" did not want to testify and Baez "has no Fifth Amendment privilege here [because t]here's nothing incriminating."

The trial court said, "He's going to have to come in, and they'll call the witness and he's either going to cooperate or not, and I'm going to have to . . . tell him, you are a witness, you don't have a privilege. You have to testify. And it's going to happen in front of the jury. [¶] . . . Depending how it goes, I'll let them know this has nothing to do with [defendant]."

Outside the presence of the jury, the prosecutor called Baez, who was in custody, as a witness. Baez stood by a doorway and refused to take the witness stand. The trial court informed Baez that he could be held in contempt, which meant he could be fined or given additional time in custody. Baez still refused to testify. The trial court ordered Baez to take the witness stand, and Baez again refused. The prosecutor requested to have Baez refuse to testify in front of the jury, even if the refusal occurred from the doorway. Defense counsel objected, and the trial court impliedly overruled the objection.

In the jury's presence, the following exchange took place:

The Court: "[S]ir, you understand you're being called as a witness by the People?

11

"[Baez]: Yes, sir.

"The Court: Sir, are you going to take the witness stand?

"[Baez]: No.

"The Court: Is there anything the court could do that would compel you to take the witness stand?

"[Baez]: No. There is nothing.

"The Court: This is just a personal choice that you're making?

"[Baez]: This is a personal choice that I'm making. I have nothing to say in this matter.

"The Court: Okay. Thank you, Mr. Baez.

"([Baez] exited the courtroom in custody.)

"The Court: Okay. Ladies and gentlemen of the jury, as I explained to you before, you know, the People call their witnesses. [Defendant] has no control over any of that, nor does he have control over witnesses. You all do understand that; correct? [¶] So the fact that Mr. Baez believes he doesn't have anything to say and is refusing to testify, you should not take that against [defendant] in any way. That's Mr. Baez's personal choice as he told you. And we're not going to force him physically onto the witness stand or anything of that nature. You understand that; right? And you're not to take that as against [defendant] in any way whatsoever. That's Mr. Baez's choice. Understood?"

Riverside County Sheriff's Senior Correctional Corporal Davalos testified that Baez gave him three kites  Davalos recognized defendant's handwriting on the kites.

12

One of the kites indicated that defendant had authority over Hispanic inmates involved in gang activity, i.e., defendant was a gang shot caller.

On direct examination, Riverside County District Attorney's Office Investigator Hankins testified that it was significant that Baez refused to testify because it has been Hankins's experience that incarcerated witnesses refuse to testify due to a fear of being attacked. On cross-examination, Hankins said he believed Baez refused to testify because Baez was scared, but Hankins clarified that was merely Hankins's belief rather than knowledge.

When instructing the jury, the trial court said, "When Julian Baez was called to testify he was in custody and refused to testify. Do not speculate about the reason he was in custody or why he refused to testify." (CALCRIM No. 337.) In a declaration from Juror No. 9, submitted in support of defendant's motion for new trial, Juror No. 9 declared, "When Julian Baez took the stand but refused to testify, the Judge told us not to put that on [defendant], but we discussed it anyway."

2. *ANALYSIS*

a. <u>Jury's Presence</u>

Defendant contends the trial court erred by having the jury present for Baez's refusal to testify because the refusal was more prejudicial than probative. (Evid. Code, § 352.) We apply the abuse of discretion standard of review. (*People v. Tran* (1996) 47 Cal.App.4th 759, 770.)

The kites aided in establishing defendant's gang activity. Davalos testified that he recognized defendant's handwriting on the kites. However, the better authenticating

13

evidence would have been Baez testifying that he received the kites from defendant and gave them to Davalos. The jury observing Baez's refusal to testify provided some explanation for the jury as to why the prosecution was relying on Davalos's recognition of defendant's handwriting, as opposed to Baez's testimony, to authenticate the kites. Thus, there was probative value in permitting the jury to observe Baez's refusal.

There was also some prejudice in the jury observing the refusal. A stipulation given to the jury would have been less dramatic and just as informative. Nevertheless, Baez did not blame defendant for Baez's refusal to testify. Rather, when in front of the jury, Baez asserted that his refusal to testify was due to a personal choice and having nothing to say in the matter. Given the probative value of the refusal and the minimal prejudice, the trial court's ruling was within the bounds of reason.

Defendant contends his right of due process was violated by permitting the jury to observe Baez's refusal to testify. Baez's refusal to testify had probative value because it explained to the jury why the prosecution did not have testimony from the person who received the kites from defendant and gave them to Davalos. Because Baez's refusal to testify had probative value, we conclude defendant's right of due process was not violated. (*Jammal v. Van de Kamp*, *supra*, 926 F.2d at p. 920 ["Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process"].)

b.      Admonition

Defendant contends the trial court erred in its admonition to the jury immediately following Baez's refusal to testify because the court repeatedly stated that Baez's

14

refusal was no fault of defendant's, which likely had the opposite effect—causing it to appear that Baez's refusal was due to defendant being dangerous.[2]

When "a witness has no constitutional or statutory right to refuse to testify, . . . [j]urors are entitled to draw a negative inference when such a witness refuses to provide relevant testimony." (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554.) In *Lopez*, a witness (Miranda) refused to testify. The appellate court concluded, "[T]he jury was entitled to consider Miranda's improper claim of privilege against him as evidence relevant to demonstrate exactly what the gang expert had opined: that gang members act as a unit to advance the cause of the gang and to protect their members. This may not have been the purpose for which Miranda was originally called as a witness but it is what he chose to provide, and we see no more reason for excluding it than if he had testified to it directly." (*Id.* at pp. 1555-1556.)

If the jury inferred that Baez did not testify due to fear of retribution, then that inference would have come from the testimony of Hankins, who said inmates sometimes refuse to testify due to a fear of being attacked and that he believed Baez refused to testify because Baez was scared. Given that (1) Hankins explicitly said he

---

[2] The trial court's admonition to the jury was ambiguous. One could reasonably interpret the admonition as instructing the jury to entirely disregard Baez's refusal to testify. For example, the trial court told the jury, "So the fact that Mr. Baez believes he doesn't have anything to say and is refusing to testify, you should not take that against [defendant] in any way. . . . And you're not to take that as against [defendant] in any way whatsoever." The instruction to not "take that as against [defendant] in any way whatsoever," could be understood as "do not use this information in determining guilt." Nevertheless, for the sake of addressing defendant's argument, we will interpret the admonition as instructing the jury not to fault defendant for Baez's refusal to testify.

believed Baez was scared, and (2) jurors are permitted to draw a negative inference from a witness's refusal to testify, we conclude the trial court's admonition was not erroneous.

D.     PROSECUTORIAL ERROR

1.     *PROCEDURAL HISTORY*

a.     Testimony of Brian Ross

Brian Ross was standing on the victim's driveway when the shooting occurred on February 5, 2014.  Ross observed defendant and defendant's accomplice ask the group, " 'Where you from?' or 'What you want?' " and then immediately begin shooting.  On April 2, 2014, Ross picked defendant's photograph from a six-person photographic line-up.  Ross selected defendant because, from the photographs provided, defendant "looked most like the shooter."

Ross recalled one of the shooters being a Hispanic male, in his late twenties or early thirties, with a light complexion, and a thin mustache.  When presented with the six-person line-up, Ross eliminated two people because their skin was too dark, then eliminated two more people who appeared too old, and eliminated the fifth person because he did not have a mustache.

Defendant was number two in the photographic line-up.  During the recross examination of Ross the following exchange took place:

"[Defense Counsel]:  So what are we left with? Number two; correct?

"[Ross]:  Correct.

16

"[Defense Counsel]: That's the only person in this six-pack that even fits the basic descriptors that you actually gave to the officer.

"[Ross]: Yes."

Ross understood that he did not have to select anyone from the photographic line-up, but he chose defendant because defendant had the closest resemblance to the shooter.

The following exchange occurred during the direct examination of Ross:

"[Prosecutor]: Now, earlier you testified that you identified [defendant] as the shooter—

"[Ross]: Yes.

"[Prosecutor]: —right? [¶] But then you qualified and you said you—you're saying that [defendant] is the shooter because he is the person that is in Number 2. [¶] Did I understand that correctly?

"[Ross]: Yes.

"[Prosecutor]: Okay. So you're not saying that independently you believe [defendant] is the shooter. You're identifying [defendant] as the person in the photograph.

"[Ross]: Yes.

"[Prosecutor]: Okay. And the person in the photograph, you're not 100 percent sure is him, but he looks most like the shooter given the choices that you were given.

"[Ross]: Yes."

### b. Expert Testimony

The trial court ruled that the expert in eyewitness identifications could give her opinion based on hypothetical facts that corresponded to the facts of this case but could not directly opine on the accuracy of Ross's identification of defendant.

### c. Closing Argument

During closing argument, defense counsel, Mr. Donath, said, "Brian Ross picked my client out of a lineup because he's the only person who matched the description he gave initially . . . and then came here in court and said, 'Yeah, that's the guy I picked out of the lineup.' That's very different than saying yes, that's the guy I remember seeing.' " Mr. Donath repeated, "Every single time Brian Ross has spoken about the identification since he identifies [defendant] just as the guy he picked out of the lineup, not as the guy he saw that night."

Mr. Donath continued, "[W]hen I went through it with Brian Ross, he gave four descriptors the night of the incident[:] Hispanic male adult, 20s to 30s, light-color skin, and a thin mustache. And when we went through it and you look at it—and you can look at it again; it will be back there with you—no one other than [defendant] meets that description in the six-pack." Mr. Donath concluded, "So we have a totally tainted six-pack lineup procedure that made this entirely untrustworthy."

The following exchange occurred during the rebuttal closing argument of the prosecutor, Mr. Brandon:

"[Prosecutor]: I look at that photographic lineup, and I don't have a Ph.D. in psychology, but I do have a brain. And I remember looking at this lineup thinking,

'Well, I don't know, is it really that far off?' [¶] You have six Hispanic guys, mustache, facial hair, shaved heads. [¶] What is so inherently suggestive about this particular lineup? Articulate it for me. [¶] They can't. [¶] What is it exactly about this lineup that was so bad it would call into question Brian Ross's identification? [¶] They never addressed that. Because the reality is, once you see it with your own eyes, you could see it's a perfectly reasonable lineup.

"[Defense Counsel]: Objection. Improper argument.

"The Court: Overruled."

Outside the presence of the jury, defense counsel clarified that his objection was based upon prosecutorial misconduct in that the prosecutor asserted the defense failed to present evidence of the line-up's suggestiveness, but the court had barred the expert from testifying on that topic.

The prosecutor said that, during the closing argument, he was trying to express "the fact that their expert wouldn't say it was bad lineup." The prosecutor continued, "I didn't include any information that was excluded. [The expert] herself specifically said she would never come into court and never [*sic*] do that because she can't say a lineup is bad." The trial court concluded, "I think it's a question for the jury to decide."

2.     *ANALYSIS*

Defendant contends the prosecutor committed misconduct by arguing that the expert did not testify that the line-up was suggestive when such testimony was prohibited.[3]

"It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 396.)

The prosecutor, said the following, in his rebuttal closing argument, "What is so inherently suggestive about this particular lineup?  Articulate it for me.  [¶]  They can't.  [¶]  What is it exactly about this lineup that was so bad it would call into question Brian Ross's identification?  [¶]  They never addressed that."

The prosecutor's argument was ambiguous because the prosecutor used the word "they."  One could understand the prosecutor as referring to the defense, in general, rather than the expert.  So, one would understand the argument as asserting that the defense failed to present evidence calling Ross's identification of defendant into question.  One could also understand the prosecutor as referring to defense counsel's closing argument—asserting that Mr. Donath failed to argue that the line-up was

_____

[3] The People assert defendant forfeited this argument by failing to object on the grounds of prosecutorial misconduct in the trial court.  Defendant did object in the trial court; he did not forfeit the issue.

20

suggestive. Despite the ambiguity of the prosecutor's argument, if such a comment were improper, then defendant was not prejudiced by it.

" 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.)

Given that Ross did not recognize defendant, but rather, by process of elimination concluded that defendant most closely resembled the shooter from six photographs in which only the photograph of defendant matched the suspect's description, there was little substance to Ross's "identification." In other words, Ross's testimony reflected that Ross did not identify defendant as the shooter, rather, Ross chose defendant as the one person who resembled the shooter from six photographs in which only defendant had the shooter's features. Thus, Ross's testimony indicated that the line-up was suggestive and that Ross did not actually recognize defendant as the shooter. As defense counsel argued in his closing, "Every single time Brian Ross has spoken about the identification since he identifies [defendant] just as the guy he picked out of the lineup, not as the guy he saw that night."

Given Ross's testimony and defense counsel's closing argument, the prosecutor's rebuttal argument concerning the line-up and Ross's "identification" would reasonably have been disregarded by the jury as ridiculous. In other words, the prosecutor's

21

comment was so far from the state of the evidence that there is not a reasonable likelihood the jury applied the comment in a prejudicial manner. Thus, a prejudicial prosecutorial error did not occur.

Defendant asserts the prosecutor's argument violated his constitutional right to a fair trial. "[A] prosecutor's argument violates the Constitution if it renders the defendant's trial 'so fundamentally unfair as to deny him due process.' Improper argument by a prosecutor reaches this threshold of fundamental unfairness if it is 'so egregious as to create a reasonable probability that the outcome was changed.' [Citation.] A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*Davis v. Zant* (1994 11th Cir.) 36 F.3d 1538, 1545.)

As explained *ante*, the prosecutor's comment was so far from the state of the evidence that the comment was most likely disregarded by the jury. Accordingly, there is not a reasonable probability that the outcome was changed, which means defendant's right to a fair trial was not violated.

E.      CUMULATIVE ERROR

Defendant asserts the cumulative effect of the foregoing alleged errors resulted in a denial of due process. The only error that may have occurred was that in the prosecutor's closing argument, and as explained *ante*, that did not rise to the level of a due process violation.

F.       MOTION FOR NEW TRIAL

1.       *PROCEDURAL HISTORY*

Defendant moved for a new trial based, in part, on juror misconduct.  Defendant asserted that, during their deliberations, jurors discussed the belief that defendant's failure to testify implied he was guilty.

Defendant provided jurors' declarations in support of his motion.  Juror No. 10 declared, "About six of us jurors (me included) talked about [defendant] not testifying.  We discussed that he 'didn't testify because he would put himself at risk because of the gang.'  We also discussed:  'if it wasn't him, why didn't he testify?'  The foreperson told us not to consider that, but we still did.  We discussed it at least twice over about an hour."  Juror No. 7 confirmed, "The jury discussed why [defendant] didn't testify."[4]

When considering the issue of juror misconduct, the trial court questioned whether the jurors' discussions about defendant's failure to testify occurred during the guilt or penalty phase of the proceedings because the timing was unclear from the jurors' declarations.  The trial court said, "The case law tells me that I'm not supposed to be going and trying to find out these type of questions, which is one of the reasons why I indicated earlier I didn't think we needed an evidentiary hearing because I'm accepting from the declarations that it was discussed at some point.  But if I don't know at what point, how can I evaluate prejudice from that perspective?"  The trial court remarked that, in the penalty phase of the proceedings, a focus of defendant's argument

---

[4] In presenting the jurors' declarations, we have omitted the portions that the trial court ruled inadmissible (Evid. Code, § 1150).

"related to identity and whether or not there should be some lingering doubt on who the shooter or shooters were," so the jury could have been discussing guilt in the penalty phase. However, the trial court determined that the misconduct "probably occurred during the guilt phase. But there's nothing in the declarations that say[s] that."

Defense counsel asserted, "Then that's a material issue of dispute that should be resolved with an evidentiary hearing." The trial court explained that there was not a dispute, rather, defendant's evidence was ambiguous. The trial court remarked, "[I]t's not my job to hold evidentiary hearings for the purpose of clarifying ambiguities" in defendant's evidence. The trial court explained that it was the attorneys' job to present evidence that was not ambiguous.

In ruling, the trial court said, "I do believe there was misconduct because the jurors did discuss [defendant's failure to testify], but there's not sufficient evidence to convince the Court that [defendant] was prejudiced by whatever discussions they had . . . . We don't know how long [the jurors talked about defendant's failure to testify]; we don't know [in] what phase of the trial [the discussions occurred]; we don't know what particular comments were said [during the discussions]. For those reasons, I don't believe that the misconduct has demonstrated prejudice. And so his motion for new trial will be denied on that basis."

2.     *ANALYSIS*

a.     Evidentiary Hearing

Defendant contends the trial court erred by not holding an evidentiary hearing concerning juror misconduct.

24

"[I]t is within the discretion of a trial court to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. This does not mean, however, that a trial court must hold an evidentiary hearing in every instance of alleged jury misconduct. The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419, fn. omitted.)

The trial court did not consider the prosecution's evidence. Thus, there was not a material conflict because only defendant's evidence was considered, and that evidence was consistent. The problem for defendant was not a conflict with the prosecutor, but a failure to provide evidence as to whether the misconduct occurred during the guilt and/or penalty phase(s) of the proceedings. Accordingly, the trial court did not abuse its discretion by not holding an evidentiary hearing.

### b. Continuance

Defendant contends the trial court erred by not granting a continuance so defense counsel could gather more evidence.

"A trial court exercises broad discretion in determining whether good cause exists to grant a continuance under section 1050." (*People v. Henderson* (2004) 115 Cal.App.4th 922, 933, fn. omitted.) "A showing of good cause requires that the party

seeking a continuance has prepared for [the hearing] with due diligence." (*Id.* at p. 934, fn. omitted.)  " 'The trial court's denial of a motion for continuance is reviewed for abuse of discretion.' " (*Ibid*, fn. omitted.)

The trial court explained that diligent "attorneys who submit declarations can look at their declarations and say, 'Well, you know what?  This is a little bit ambiguous. So I'm going to go back and potentially clarify this point with this juror so that the context and the facts by [*sic*] which I'm presenting to the Court are not ambiguous.' " In other words, the trial court found that diligence had not been demonstrated because a diligent attorney would have cured the ambiguity in the jurors' declarations prior to the hearing.  The trial court's conclusion is reasonable because it may have been helpful to know whether the jurors' discussions occurred in the guilt or penalty phases of the proceedings, and therefore, a diligent attorney would have clarified that evidence prior to the hearing.  Thus, the trial court did not err in concluding there was a lack of good cause for a continuance.

c.     Presumption of Prejudice

Defendant asserts he demonstrated serious juror misconduct, and the prosecution did not rebut the presumption of prejudice from such misconduct, so the trial court erred by denying defendant's motion for new trial.  Defendant's argument does not explicitly specify if the misconduct occurred during the guilt and/or penalty phase(s) of the proceedings, but we will assume it occurred during the guilt phase.

Jurors commit misconduct when they disregard a court's instruction to not discuss a defendant's decision to not testify.  (*People v. Lavender* (2014) 60 Cal.4th

26

679, 687.)  Such misconduct gives "rise to a presumption of prejudice, which may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct."  (*Ibid.*)

We proceed with examining the reasonable probability of actual harm resulting from the misconduct if the discussions occurred in the guilt phase of the trial.  Prejudice is not evaluated based on the strength of the trial evidence related to the defendant's guilt.  (*People v. Solorio* (2017) 17 Cal.App.5th 398, 408 (*Solorio*).)  Rather, the prejudice analysis involves various factors that we will address in turn.

"The first rebuttal factor considers whether jurors drew adverse inferences of guilt from defendant's decision not to testify."  (*Solorio, supra,* 17 Cal.App.5th at p. 409.)  Juror No. 10 declared that the jury questioned, " 'if it wasn't him, why didn't he testify,' " and concluded "that he 'didn't testify because he would put himself at risk because of the gang."  Juror No. 10's declaration can be understood as expressing the belief that defendant did not testify because testifying might cause him to suffer gang retribution.[5]  In other words, the jury did not infer that defendant elected not to testify due to guilt, but due to potential violence by gang members.

Juror No. 7 declared, "During deliberations in the guilt phase . . . I told my brother that I didn't believe [defendant] was the shooter. . . .  He asked 'why?'  I

---

[5] Juror No. 9 explained the following regarding the allegations of defendant's gang membership:  "Since the defense told us that [defendant] was a gang member, we had no discussion about the special circumstance or enhancement gang allegations."

27

explained how the eyewitness clearly testified that the gun was brought up with the right hand and I had noticed that [defendant] was left-handed." Accordingly, Juror No. 7 had questions about defendant's guilt.

In sum, defendant's decision not to testify did not cause the jury to infer defendant was guilty because (1) Juror No. 10 thought defendant did not testify due to the risk of gang retribution; and (2) Juror No. 7 did not believe defendant was a shooter.

"The second rebuttal factor considers the length of discussion about the topic." (*Solorio, supra,* 17 Cal.App.5th at p. 410.) Juror No. 10 declared, "The foreperson told us not to consider that, but we still did. We discussed it at least twice over about an hour." The foregoing sentence could mean: (1) the jury discussed defendant's decision not to testify twice, for an unknown amount of time, within a one-hour period of time; or (2) the jury discussed the decision not to testify twice for a total of an hour. Given that the foreperson instructed the jurors to stop talking about defendant's decision to not testify, it is unlikely that jurors spent an hour talking about the issue. Thus, we infer that the jurors spoke about the issue twice, for an unknown number of minutes, within a one-hour period.

"The third rebuttal factor . . . considers whether jurors were reminded not to consider the defendant's decision not to testify." (*Solorio*, *supra*, 17 Cal.App.5th at p. 410.) As set forth *ante*, the foreperson reminded the jurors not to consider defendant's decision not to testify.

In sum, (1) defendant's decision not to testify did not cause the jurors to infer defendant was guilty; (2) the topic was discussed twice for a total of less than one hour;

and (3) the jurors were reminded not to consider defendant's decision not to testify. These factors indicate that there is not a reasonable probability of actual harm resulting from the misconduct because the misconduct, if it occurred during the guilt phase of the proceedings, did not cause the jurors to infer defendant was guilty. Accordingly, the misconduct was not prejudicial, and the trial court did not err by denying defendant's motion for new trial.

### d. Constitutional Rights

Defendant asserts the jury's misconduct violated defendant's Fifth Amendment right against self-incrimination, his Sixth Amendment right to an impartial jury, and his Fourteenth Amendment right to a fair trial. Because we concluded *ante* that the misconduct was not prejudicial, it does not rise to the level of a violation of constitutional rights.

### G. ABSTRACT OF JUDGMENT

The jury found defendant was a principal part of the murder and attempted murders. (Former § 12022.53, subd. (e) [eff. Jan. 2012 to Dec. 2017].)

For the attempted murder convictions (Counts 2 through 7), the determinate abstract of judgment incorrectly indicates that the jury found defendant personally discharged a firearm. (Former § 12022.53, subd. (c) [eff. Jan. 2012 to Dec. 2017].) For the murder conviction (Count 1), the indeterminate abstract of judgment incorrectly reflects that the jury found defendant personally discharged a firearm at an occupied house (§ 246) causing death. (Former § 12022.53, subd. (d) [eff. Jan. 2021 to Dec. 2017].)

29

Defendant contends the abstracts of judgment should be corrected to reflect the jury's finding that defendant was a principal in the crimes, i.e., the citations should be to subdivision (e), of section 12022.53, rather than subdivisions (c), and (d). The People concede that the determinate abstract of judgment should be corrected, but the People fail to mention the indeterminate abstract of judgment. We will direct the trial court to correct both abstracts of judgment to reflect the jury's findings.

**DISPOSITION**

The judgment is affirmed. The trial court is directed to correct the determinate abstract of judgment (Counts 2 through 7) to reflect that the section 12022.53 enhancements concern subdivision (e), not subdivision (c), and correct the indeterminate abstract of judgment (Count 1) to reflect that the section 12022.53 enhancement concerns subdivision (e), not subdivision (d), and then forward a certified copy of the amended abstract to the appropriate authorities. (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 467.).

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____
J.

We concur:

McKINSTER_____
Acting P. J.

CODRINGTON_____
J.

30